[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action initiated by John Fracassini, an attorney and executor of the Estate of Mary Lewis, against O'Connor Real Estate, Inc. and Carmella Errico, an individual real estate agent working for O'Connor Real Estate. The two count complaint sounding in breach of contract and negligence basically makes the claim that, pursuant to a listing agreement, a lock box agreement and certain oral statements attributed to Mrs. Errico, the defendants assumed an obligation to manage and inspect the premises subject to the listing agreement, and therefore the damages caused to the premises by broken water lines are the responsibility of the defendants. Since the commencement of this action, Mrs. Errico has died.
As far as background, the plaintiff's decedent, Mary Lewis, died on November 1, 1992, and the plaintiff was duly qualified as executor. At the time of her death, Mrs. Lewis was living at 200 Chelsea Street in Stratford, Connecticut, with her daughter Mary Ann Desenroth, who was the named beneficiary of the premises. The plaintiff sought out the services of Carmella Errico, a friend, to prepare an appraisal of the property which was done. CT Page 7312
Thereafter, on May 4, 1993, Mrs. Desenroth died and the premises remained vacant through January 8, 1994. The plaintiff again sought out the services of Mrs. Errico to do a current appraisal and to prepare to list the property for sale. The plaintiff acquired the services of several contractors to do work both inside and outside the premises to ready them for sale, and he paid the bills for that work. By his admission, he always paid for the utilities on the property.
On August 3, 1993, Mrs. Errico went to the plaintiff's law office in Monroe where he signed a listing agreement placing the property on multiple listing through the O'Connor Real Estate and a lock box agreement that basically allowed a key to be left on the premises in a locked container so that realtors could enter the property without the necessity of anyone being present to open the door. (See defendant's exhibits B and C.) Any fair reading of those documents places no obligation on either of the defendants to manage or inspect the premises or to assume any responsibility for the care of the premises that is not contained in the agreements.
Two weeks later the plaintiff had a conversation with Mrs. Errico wherein he claims she said to him that she would take care of the house. Although he admits she never used the words "inspect, manage or control", his expectation was that she would in fact inspect the premises periodically. To a question posed by the court, he indicated his expectation was that these inspections would take place every two weeks or monthly.
Claire A. Hoff, another daughter of the deceased Mrs. Lewis, testified that subsequent to the listing of the property she also had a conversation with Mrs. Errico wherein Mrs. Errico explained the purpose of the lock box, told her she should not go into the premises any longer and represented that she (Hoff) would not have to worry about the premises any more and that she (Errico) would take care of everything. Mrs. Hoff admitted that Mrs. Errico never stated that she would manage or inspect the premises. Although Mrs. Hoff retained a key to the back door, she claims she never went back to the house although she admitted she could have. The mail was picked up by a neighbor and sent to Mr. Fracassini.
During the ensuing months, the property was shown on several occasions as is evidenced by defendant's exhibit I, a log sheet. The plaintiff testified that someone called him in early November of 1993 advising him that the heat was off at the Chelsea Street address. He does not know who called him. On November 10, 1993, he made arrangements with Sippin Fuel to go to the premises to correct the problem, which was a broken toggle CT Page 7313 switch and it was repaired. The plaintiff never advised Mrs. Errico thereafter that she was failing in her responsibility towards the property.
The oil tank located in the basement of 200 Chelsea Street had a capacity of 275 gallons. The plaintiff admitted that from May 4, 1993 until January 8, 1994 he did not have any oil delivered to the premises, nor did he make any arrangements with any fuel supplier to check oil levels, to supply oil or to initiate any automatic fill up procedure.
Prior to January 8, 1994, the log book, defendant's exhibit I, indicated that the last time the property was shown was on December 12, 1993. That is not entirely accurate because agents of O'Connor Realty do not sign the log book and other outside agents may not sign it either. Be that as it may, the property was shown on January 8, 1994, by an outside agent, Melinda Elim, who upon entering the premises heard running water and noticed water in the basement ankle deep. There was no visible water upstairs in the living room, kitchen or bathroom. She observed no open windows, mildew or ice on the first floor. Mrs. Elim did call O'Connor Realty and advised it of the problem. Her testimony by deposition was admitted without objection as defendant's exhibit M.
Mrs. Errico immediately notified the plaintiff who called a contractor friend, John Coliaicomo, to go to the premises and check it out. He gave Coliaicomo Mrs. Errico's phone number and asked him to make arrangements with her to meet at the premises. He himself did not go. He testified that Mrs. Errico told him she had not inspected the premises or been there since the listing agreement. Coliaicomo, who had been plowing snow, did not go to the premises until the next day. When he went in, he noticed water and ice on the first floor, the burst or broken water lines, both in the bathroom and kitchen, and broken bathroom fixtures. When he looked in the basement, there was by then three to four feet of water, and he could observe water flowing into the basement from upstairs at a steady flow. He then shut off the water to the house.
Coliaicomo had the water pumped out from the basement and thereafter did all the work to restore the property. There does not appear to be any quarrel concerning the costs for these services and several bills are in evidence. The total cost for repairing the damage to the premises was $15,204.51, which was paid by the plaintiff.
Several other factors need to be discussed before dealing with the law of the case. When the heat was restored to the house on January 10, 1994, the plaintiff had Santa Fuel deliver fuel in the amount of 242.9 gallons to a 275 gallon tank. So the tank was almost empty or the equivalent of empty. Neither party presented any evidence, expert or otherwise, as to CT Page 7314 the cause of the broken pipes on the first floor.
Did the furnace malfunction or did the furnace shut off because there was so little oil in the tank as indicated by its taking 242.9 gallons on January 10th? The court is left to speculate. Remember, the plaintiff had made no provisions for heating oil since May of 1993. This would clearly be the plaintiff's responsibility, not the real estate firm's.
It was also testified to that the plaintiff did turn this claim over to his insurance carrier on the property, and he testified that the agent, a Mr. Malafronte, told him that water damage to a vacant building is excluded from the policy coverage. Is that not the plaintiff's own responsibility? In lieu of that exclusion, should not the water have been shut off once the plaintiff knew that the property would be vacant indefinitely? It was only after insurance coverage was denied that the plaintiff told Errico and O'Connor of their claimed liability.
In the first count of the complaint, the plaintiff claims that the defendants were in control of the premises and they breached their contract with the plaintiff by failing to use reasonable care and inspection of the house. In paragraph 8 of that count, the plaintiff alleges that on or about December 20, 1993, due to an open window, water pipes burst sending water throughout the house. There is no proof a window was open and in fact the evidence is to the contrary. As has already been stated, there is no proof of what caused the furnace to shut off and no proof of when it happened. All we know is that it was some time between December 12, 1993 and January 8, 1994. Anything beyond that as to cause or time is purely speculative.
In reviewing the listing agreement and lock box agreement, there is nothing contained therein to impose any liability on the defendants to manage, control or inspect the premises. In fact, the lock box agreement contains a clause that indemnifies the realty firm and its associates from any damage arising out of its carrying out that agreement. The duties of a real estate broker are limited to those of honesty, loyalty and full disclosure of all material facts concerning the transaction.Licari v. Blackwelder, 14 Conn. App. 46, 1988.
Therefore, the only way the plaintiff can establish its claim sounding in breach of contract would be some express oral representation made by the defendant Errico. Unless she made such a statement and under took such a responsibility, then the obligation to control, manage and inspect the premises remained with the executor. The plaintiff executor makes such a claim, but his credibility must be assessed just like anyone else's. He also testified that he was forced to sign the lock box agreement as it was a mandatory requirement of a multiple listing CT Page 7315 agreement, contrary to the testimony of Mrs. O'Connor and the language right on the face of the lock box agreement (defendant's exhibit F) that, "It is not a requirement of MLS or Broker that a Seller use a lock box."
Certainly, there is no claim that Mrs. Errico made any such statements on the signing of the listing and lockbox agreement on August 3, 1993. So, therefore, the plaintiff must be referring to his conversation with Mrs. Errico some two weeks later as well as the conversation between Mrs. Hoff and Mrs. Errico. As far as the plaintiff is concerned, the best evidence of any oral contract to manage or inspect the premises would have been Mrs. Errico's statement that she would take care of the house. But that statement could just as easily be interpreted to mean she would take all steps to advertise and sell the house. If the plaintiff executor was attempting to transfer his responsibility to control, manage and inspect the premises, he should have gotten Mrs. Errico to do it in nonequivocal terms. None of those words were even used and the words used are not sufficient to establish an oral agreement to manage or inspect the premises. The plaintiff has failed in its proof on the first count and judgment will enter for the defendants.
The second count of the complaint sounds in negligence. In addition to the claims of a failure to manage and inspect the premises, the plaintiff also claims that the defendants should have advised him that they were not inspecting the premises and they knew or should have known that the house would suffer damages. As the court has already opined, there was no contractual obligation that was ever assumed by the defendants, and the plaintiff has failed to demonstrate any statutory or common law requirement for a real estate agent to manage or inspect the premises. Even assuming, arguendo, that there was such a duty, there is no proof that the failure to inspect was the proximate cause of the ensuing damage to the property.
The court is left to speculate and guess as to what actually caused the pipes to burst. It is more likely than not that it was caused by the furnace running out of fuel, but that is not the basis of this opinion.
It is even more obvious that if the plaintiff went to the scene immediately upon hearing of the problem, when the water was only ankle deep in the basement and there was no water, ice or mildew on the first floor and shut off the water, the damages would have been very limited. Again, the plaintiff has failed to establish by the necessary standard of proof its claim of negligence and judgment shall enter for the defendant on the second count.
The court cannot leave this matter without a final observation. It is this court's opinion that when the executor became aware of the condition CT Page 7316 of the house on January 8, 1994, he should have resigned as executor, so advised the remaining heirs and allowed a substitute executor to determine wherein the fault actually rested in this case. It is certainly possible that some of the fault was that of the plaintiff. By taking the offensive and suing the defendant, he has diverted any attention or review of any possible liability that he himself might owe to his client. The specter of a conflict of interest was apparent.
GORMLEY, J.